All right, our first case for the day, and thank you for your patience, is Alaris Health v. NLRB, numbers 23-1946 and 22-1976. And we'll hear from petitioner's counsel and cross-respondent. Good afternoon. My name is Stuart Weinberger. I represent, as you just indicated, petitioner and cross-respondent. I would request 12 minutes and three minutes for rebuttal. That's granted. Okay. Okay, thank you. This case involves bonuses and gifts that were provided and discontinued and modified. The company asserts that the company's actions in giving this bonus and gifts is justified and allowable on two grounds. First, it's allowable under applicable NLRB law. And second, it's allowable because there was an expired collective bargaining agreement that gave us the right to do this. Now, this bonus was an appreciation. It was given in the backdrop of COVID. But wasn't it tied, though, to hours? It is not tied to hours. It was tied to being there in attendance. You could have worked. Well, that's sort of what I meant. Hours at the facility, right? It was tied to your coming to work. It is not tied to any of these typical employment things that you see for a bonus. Generally, when you talk about a bonus being tied to things when it's not a bonus. Well, let me just step back. There's a distinction between a bonus and a bonus which is a gift. If a bonus is an employment term, then a bonus has to be bargained with with the union and bargained when you take it away. If it is a gift, you do not have to do that. Generally, something given what you judge when you judge whether something's a bonus that's a gift or a bonus that's part of employment. You look at the regularity of the bonus and whether payment of the bonus was tied to employment related factors. So in answer to the question before, it wasn't really tied to employment. Wasn't tied to work performance, earnings, seniority, production or any other such factors. And this is not the first time courts of appeals have been faced with things like this. Second Circuit, United H.E.R.E., I'm sorry, versus NLRB. Second Circuit, stock was provided based on the amount of time you worked. You had to be there six months. Phelps Dodge, another Eighth Circuit case. Appreciation bonus given for hours. Given for 80 hours of work. Excuse me, did you respond to the information request? That's a different issue. The information request was a request. OK. If this is not the issue in this case, the information, there are two aspects of that. One was for health insurance and things like that, which we're not contesting. The union had sent a letter out before talking about this. But remember, we're in the context of COVID. There's another also very, very important factor here. We had an expired collective bargaining agreement, which gave us the right to do this. We had bargained to do this. We notified the union. Excuse me, did the collective bargaining agreement make provisions for what rights were retained after the expiration of the contract? Well, this case, I think, is governed by the theories of PG publishing. That's this case. And it's almost not exactly a mirror image. It's corollary. What the court says, which the NLB doesn't follow, by the way, is that you look at the contract. You interpret it as ordinary contract terms. See if it's still in existence. See if it's not. You look at the terms. And if you look at the terms of this contract, it's part of what gave us the right to do this is not in a management's rights clause. The NLB has gone off on tangents that if anything's discretionary, it's a management's rights clause. This was a negotiated provision in the wage provision like any other wage provision. But did it persist after? I think we all agree that the CBA expired, right? So isn't the issue whether in terms of applying PG, whether this particular provision, 10B, I guess it is, persists to today? Yes. The answer is, well, not today, the facility closed, but it persisted at that time. The answer is yes. You look at the contract, this ordinary contract interpretation. It doesn't say in there that it expires. It's one of the terms that continues. We have Linton. Linton says the terms basically, not all, most terms stay status quo. There's nothing in this contract that said that it changes. There's nothing that it points to. This is really the PGC case, the PG publishing case, just a car lawyer as I said to that. Did we lay out a test in that case for what provisions are included in the status quo? Well, the test is you look at the contract and you interpret it based on ordinary contract interpretation. So some things expired in PGV, in PG publishing. PGV is another important case. PG publishing, the issue was whether a term, whether the staffing provision remained. And there was a fixed date it said it terminates. I think it was March something. I don't remember. So there the court said it terminates. But there's nothing in this contract that says it terminates. The board has done something very harmful to collective bargaining. And this is one of the several cases going on in sequence, not before this court, but some of the cases. What's so harmful is you negotiate terms and you stop at the status quo. That's what it says. You look at the contract and you see if it's part of the ordinary terms. You see if it's expired. You see the intent. And then you determine whether it expired. But the terms are there. What the NLRB is doing is removing terms on the basis that there's management discretion or management right clauses. But the parties have negotiated for this. The test is a simple and ordinary contract test. You have Tackett. You have Reese repeating the same thing. Look at the contract. It doesn't say it terminates. There's no indication. Well, at the beginning, it has a term. The CBA does, right? Yes. But the Supreme Court — I didn't mean to interrupt you. No, no. But I'm wondering, if we look solely at Section 10B, is there any reason and there any indicia that that was intended to continue to be effective after the cessation date of the CBA? Well, that's the whole point of all the terms of the contract. You look at the contract. You see if it ends. If you see if something — again, not all terms, most continue. And if there's an ending point like PG, then it ends. But if it doesn't end, then it's supposed to continue. The NLRB can't take out clauses it doesn't like, the things that were negotiated. It's just not the way bargaining is. If you take that philosophy, then the contract clauses disappeared. But it hasn't disappeared. It was bargained for. Until somebody changes it, those should be the terms. It has to be as the test — as the test is. Just PG. We are thus directed to the language of the CBA in question to ordinary principles of contract interpretation to determine whether a particular term for us is part of the status quo. Doesn't PG say that if the language of the CBA does not indicate that the term persists as part of the status quo, then it doesn't? Like you have to affirmatively say this provision will continue beyond expiration. No, I do not think. I think that's rejected by the Supreme Court. Actually, it would be rejected by Linton, rejected by Tackett, rejected by Reese. That's what the NLRB is trying to say. Explicit, unless you explicitly say it, it doesn't continue. It does continue. Linton and the Supreme Court cases might say otherwise, but did we say that in PG publishing? Say what? I'm sorry. Didn't we say that in PG publishing? So PG publishing might be wrong under Linton. I understand where you're going, but isn't that what we said in PG publishing? If you want it to continue beyond, you have to say so? No, I don't believe the court really said that in PG publishing. The court didn't say you have to say it. The court said you look at the ordinary terms. Now, if it continues, if you want to waive it, you have to explicitly waive it. So let's say the term in that case, again, to use that case. That term said you had to have certain staffing requirements. And it said it was going to expire as of, I think it was March of whatever year. So you look at the contract, you see the end date, and it ends. But other terms don't end. That's the whole point of all these cases and has been for years and years. You can't just take out provisions you don't like. The board doesn't have the authority. Like in H.K. Porter, the board, the issue was whether they could have a union security clause. This is analogous to this. You can't put in clauses. You can't put in contract clauses you like and take out things you don't like. The parties have negotiated a contract. When we go to negotiate tomorrow morning, if I go to negotiate a contract, I look at the contract, I see what's existing, if it's expired. I see what's left and what hasn't expired. And then you go from here. That's the whole point of PG Publishing. That's the whole point of Lytton. That's the whole point of Tackett. That's the whole point of Reese. But not only is this dangerous, what is done like this, again interfering really with the collective bargaining process. Things just can't disappear.  That's the whole point of bargaining. Except if it expires. But not only has the board done that, and we're talking about the expired collective bargaining. We actually think it's a gift, so you may not even have to reach it. The remedy here is just unprecedented. What was done here is you have finite bonuses being given out. It ends for this period to that period. What the board has said is that's not what happened. You committed an unfair labor practice, so it continues on. Nobody negotiated it. I'm saying here, in a very important point, what I'm trying to say is collective bargaining. You're supposed to bargain. Nobody bargained to keep this 100% clause forever. It was stated. It was finite. The board doesn't have a right to punish parties. The board is limited. Supreme Court, H.K. Porter, the board created these new contract terms. We never said 100% was going to give it. If we were wrong and we implemented it wrong and we discontinued it wrong, yes, it should be remedied. But the remedy isn't to create a whole new contract. And another, I see. I understand the argument about the remedy. It kind of makes sense to me. A problem that I'm having is that you're supposed to make those answers, those objections, those answers specifically when you answer and not make a general denial. And I think Alaris made a general denial and so perhaps forfeited this exact argument you're making on the remedy. Can I respond to that? Yes. I'm sorry. No, go ahead. Okay. I don't think it was possible to answer this. First, it was a motion for summary judgment. This is not exactly how the strange denouement of this case, by the way. It was a motion for summary judgment made on the eve of trial before the administrative law judge. It was responded to. We won. The case was over. Nobody said whether the NLRB's papers were sufficient or not. Nobody said anything. Nobody even knew what the NLRB was going to hold because the NLRB case law, I don't care what anybody says with all due respect, has been so inconsistent the last 10 years. Nobody could answer that really. So how are you supposed to know, Judge, honestly, of what you're denying if you have no idea first what bonus allegedly was wrong, what bonus the board was going to find is wrong? How can you answer it? There was no way to answer it. And the terrible thing was we didn't get the chance. The judge never even ruled the ALJ whether the papers were sufficient or not. The judge never gave us a chance to do any of this. The board, in an appeal, decided that everything was okay, the numbers were okay, the specificity was okay, even though the ALJ never even ruled on it. We've had no chance because in order, and if I can for one more minute. Go ahead. If I can point out, Judge, we have a compliance spec. You go back. Specification, I'm sorry. You go back, you look at the numbers, you figure out what the violation is, then you get a little information from both sides, and then you plug it in. We didn't do that. We have no idea where these calculations are from. They're like it's in our appendix. It's just the general numbers. We don't know. All right, so if we disagree with you, you're saying the remand is in order to allow the parties to air out just how much would be owed and what the theory is? Well, if you disagree with us, if you disagree, hopefully you will not, but if you do, it's obviously a remand. I mean, this was really. The answer is yes. The answer is yes. I'm sorry, Judge. I may have gone over. No, that's okay. Okay, thank you. We'll get you on rebuttal. Okay, thank you. Thank you. Good morning, Your Honor, or good afternoon, Your Honor. May it please the Court, David Sy for the Labor Board. There's a lot to unpack there, but let me first start with the bonus issue and the Board's finding the substantial evidence as to why the Board reasonably found that the bonus was a term and condition of employment that could not be unilaterally changed. First and foremost, as indicated, the bonus was based on an employment-related factor, the hours that employees worked during the pandemic. And the company counsel made reference to the Unite Here case in the Second Circuit, and in that case the Second Circuit specifically recognized that something given based on the number of hours worked would constitute a term and condition of employment that could not be unilaterally changed. And I would also note that the company's own opening brief at page 6 referred to the bonus as an incentive to continue working. That's not a gift. It was an incentive to ensure that employees continued to show up for work during this time of the pandemic where they were taking care of patients. It was very dangerous. In fact, one of the letters that the company had sent out in mid-May referred to employees who had gotten sick and some of whom may have even died. So these were employees that were literally, as the company recognized, putting their lives on the line to show up and to continue to work, and this was an incentive for them to do so. Not a gift. The Board's finding was very reasonable in that context. And then secondly, with respect to the bonus, there's really no serious dispute here that the company did not give the union a notice and an opportunity to bargain before initially implementing changes and then reducing and eliminating it. To the contrary, the company stipulated that it did not provide the union or its attorney with copies of the memo prior to posting and announcing the implementations and changes of the facilities. With respect to the contract permitting the unilateral change, simply because the contract contained language that allowed the employer to implement bonuses during the term of the contract, the company is really just fundamentally misplaced on what is meant by the status quo. The status quo is not the contract. Upon expiration, the contract ceases to exist. The status quo are the terms and conditions of employment that exist at the time of expiration, and they emanate from the act as a matter of law. Now, oftentimes those terms will come from the contract. They can also be based on past practice and procedures. And in this respect- Does that come into play in this case, custom practice procedure? No, it doesn't. That's correct, Your Honor. It does not. There's no evidence that at any point during the term of the contract between 2010 and 2014, the company had any policy of implementing any bonuses. And certainly once the contract expired up until 2020, there was no evidence whatsoever that it had ever implemented or imposed bonuses. And the PG publishing case does not require a different result because it was a completely different issue that this Court was addressing. In that case, the Court was addressing whether language in a collective bargaining agreement that on its surface guaranteed employees five shifts per week would continue after contract expiration, notwithstanding language that would seem to indicate that it might not. And in overturning the Board's finding, the Court did, as was indicated, I believe, by Judge Porter, specifically stated at page 212 and 213 of that decision, we are thus directed to the ordinary language of contract interpretation to determine whether a particular term forms part of the status quo. If the language of the CBA does not indicate that the term in question persists as part of the status quo, the inquiry ends. And that's exactly what we have here. And I would also note that the reasoning that underlies the Board's decision here, its decision in the Nexstar case, its reference and analogy to a management rights clause, the company's opening brief is not... About Nexstar, didn't we reject that basically in our PG case? I notice your brief relies on it. I don't think it's good law here, is it? Your Honor, to the extent that the Board in Nexstar is stating that in the context of a provision that would allow an employer to make a unilateral change, that was not something that this Court... Well, maybe I'm talking about we declined to adopt an express statement rule. I think that Nexstar did. Your Honor, there's really two different issues. In the Nexstar case, two of the Board members, actually President Trump appointees to the Board, dissented in the PG publishing case because they took the view that after expiration of a contract, that essentially an employer should have broader abilities to make changes. Those very two same Board members who were involved in the majority decision in Nexstar and also wrote the decision here are recognizing there's a difference between a contract term that does have some specifics and an issue as to whether or not that survives a contract versus a situation like what we have here where an employer has complete discretion to make certain unilateral changes and whether that survives a contract. That's totally different. So, again, the two dissenting Board members who actually would have likely agreed with the decision that this Court issued in PG publishing are the same Board members that were involved in the Nexstar decision and this decision here, that there's really just a fundamental difference that's involved. And finally, with respect to the remedy... Before you move on, your friend says that my summary of PG publishing, and I guess the way you just articulated it, would violate Litton. I assume you disagree, but why is that? I'm honestly not quite sure what counsel is referring to because, again, Litton was making very clear as to what the status quo means. And the status quo is not the contract. The status quo emanates under law from the Act, and it may encompass and likely does encompass many terms of the contract, but it can also encompass past practice. So the contract ceases to exist. So with all due respect to opposing counsel, I'm not entirely sure why there would be a view that PG publishing conflicts with Litton. And if I just might mention about the remedy, very simply, the company is precluded from raising any challenge to the remedy before this Court. It simply has no jurisdiction to consider that argument because it was never raised. Well, I mean, you know, his argument does make some sense. I mean, he's going to spin his wheels. They move for basically to dismiss the case, and then he's supposed to get into the minutia of the damages remedy there? Does that make any sense? Your Honor, in the context here, it does, because initially the complaint that was issued had a full compliance specification, setting forth how much employees were owed. And this is information that the company had fully available to it. It knows how much each employee was making. It knows what it meant to be giving them 25 percent or 50 percent or 100 percent. And the calculations, which run for, I believe, almost 200 pages for each employee, broken down by week, by month, are very detailed. And the employer had every opportunity to raise objections to that. First, its answer, the Board found, was deficient. It was given an opportunity to correct that deficiency. It never did. Is that really reasonable, though? They're going to go through hundreds of pages of calculations on something where they were just seeking to dismiss the thing in the first place? I mean, that's an awfully – that's a big burden on not only the attorney, but its client. Your Honor, this was even before this case even got to the Administrative Law Judge. The complaint issue is before the hearing. And so before the hearing, the company filed an answer in which the General Counsel notified the company that the answer was not sufficient and giving it an opportunity to file a sufficient answer. Crickets. There's no response. The trial doesn't take place, and then there's a movement for summary judgment, which the General Counsel had alerted the company that that's the next step it would take. Several months later, files for summary judgment. There's still a number of months that go on, I think at least three months before the Administrative Law Judge trial. The Administrative Law Judge trial still crickets. At the hearing, at the end of the hearing, the judge gives the company another opportunity to file something in response to the motion for partial summary judgment. Again, nothing gets filed. So for the company to now claim to this court that it wasn't given an opportunity or that it was too hard to have come up with any response, those are all things that needed to be timely raised to the board, which they simply weren't. And again, it's not very complicated that if Joe Smith was earning $10 an hour and the bonus was 25% for three months, what that back pay would entail. It's really not very difficult. The company is not being put into any sort of disadvantaged position, nonetheless given the fact that it's simply not before this court. So the board reversed the ALJ. How did the ALJ error here? Sure. So first it's the board's decision that's before this court, and the standard of review does not in any way change. And so it's set forth in the board's decision. The Administrative Law Judge correctly set forth what the law is with respect to a bonus versus a gift. But the board very reasonably found that the judge misapplied that law in failing to recognize that it was based on a determined condition of employment. And so that was the primary difference between the board and the Administrative Law Judge. And so just so I understand, if it was a determined condition of employment, it wasn't really a one-time bonus. It was a permanent increase in wages. Is that how it works? Your Honor, it's considered, again, duration is not necessarily a determining factor. But here, the bonus did continue in some shape or form for almost seven months. I mean, the duration seemed to have mattered to the employer. He thought it was a one-time bonus. Not that he was increasing everyone's wages by 20 or 50 or 100 percent. Your Honor, the communications that the company had when they posted the memos was rather opaque. The initial memo says at least through April 30th. Just a week later, there is a substantial change in the amount of the bonus that's being given. At later times, it starts to reduce the bonus. One of the main memos states that it will continue until the end of May. Well, those very terms ended up continuing to the end of July. So the messaging that was being sent to employees was certainly not entirely clear. And the suggestion that this was just like a one-time or a very short-term bonus, given the fact that it did last for seven months, really does, as the board stated, detract from any suggestion that this was not a one-weekend or a one-day amount of money that was being given. This was being given throughout the pandemic, as the company acknowledged in its opening brief, to give them incentive to continue to show up for work. Did it indicate any evaluation of the quality of the work that the employees were doing? Your Honor, I'm not aware that it was based on the particular quality of the work, as long as they were showing up and they were working. But as the company itself indicated, this was a difficult time to have these employees to continue to do the job that they were doing. Unlike myself and, dare I say, many in the courtroom here today, they did not have the luxury of working from home. They had to show up for work, literally, again, as the company itself recognized, putting their lives on the line. So giving them additional money for that purpose is very reasonably found not to be a gift, but rather to be a term and condition of employment. And the last thing I would just say very quickly, although the remedy is not before this Court, it's speculation as to what may or may not have happened had the union been able to bargain with the company. But it is not in any way a penalty for the company to, in context of back pay, to owe these employees for the money throughout the entire back pay period. And I would also just add that the total back pay here amounts on average to less than, or just a little over $5,000 per employee. It's less than $1,000 a month during the back pay period. And these are employees who are not exactly very well paid to start with. So it's doubtful that they would look at this or that the union would look at this. This is some type of great windfall that they somehow really took the employer to the cleaners by having the Board's order enforced here. If there are no further questions, the Board would simply ask that the Court enforce its order. Thank you, Your Honor. Thank you, Counsel. And we'll hear from your adversary on rebuttal. Thank you. A couple of things to say. Something was said before that the status quo emanates from the act and not from the contract. I don't agree with that. That's not an accurate statement. It's partially true. Obviously, the act determines. But you determine the status quo based on what has been bargained for, and that's where you bargain. That's the whole definition of bargaining. The idea that somehow that clause disappears, to answer a few judges' questions, and maybe I'm not conveying what Litton said, and I'm not sure, Judge, I'm saying you're saying something that's different than Litton. What I think Litton said, to attack it and erase, is you look at the contract. If it appears from the contract, from ordinary interpretation of contract, the term disappears, the term is finished. That's PG publishing. But if it doesn't, that forms the status quo. That's where you start bargaining. Under the NLRB's interpretation of management's rights in this clause, this clause has now disappeared from bargaining, apparently. Does the NLRB have the authority to say this clause has disappeared from bargaining? No. Also, just a couple of quick things. Not exactly clear from the logic explanation. I want to clear something up. Here's what happened. On the eve of the case for the NLRB, for the ALJ, not the NLRB, the NLRB filed a motion for summary judgment. Now, again, it's great to file it, but nobody knows what the real thing is the problem. You can allege what you want, but I agree with the judge. How could you figure out which bonus was which? What was lawful? What wasn't lawful? Yeah, but your adversary points out that you've got hundreds of pages of calculations and all that. It was within your power to do something, is what he responded. So how do you respond to that? We couldn't have done anything because we couldn't tell what bonus was wrong. Each bonus, and this is where we disagree totally, and this is in the record, when we gave out the letter and posted it, and we had a trial, by the way, and it was credible, the judge found that we satisfied the notice requirement, we had a witness, stated it was for a finite period. How would we know if bonus one is no good, bonus two is no good, bonus three is no good? There's no way to know that. And what's so incredible here, and I think it was asked before, what the NLRB did is take a bonus that was a finite period. We could read from it here and say, oh, no, it's not finite anymore. What are we to make of the fact that you denied to respond to an information request and then you were asked at the ALJ hearing subsequently to do it again? I'm not sure exactly what you're referring. We denied an information request. The information request had nothing to do with these bonuses. It was sent, I think, part of the appendix before. There was an information request regarding insurance. There was some correspondence. Again, this was COVID. The union was known and notified. We followed what was in the contract. Nobody asked us information of what the dollars based, what 100% of the 25. The union said, we agree. This is another crazy thing here. Two of the first two, the union said, we agree, but we deem this to be a wage increase, so if you have to change it, you have to bargain. And this is where we have a fundamental problem. This wasn't a wage increase. For goodness sakes, people were coming in. This was an appreciation. This is why you give a gift. I don't know if this has been morphed into something that it's not. Well, your advisory points out, your brief says, on page six, it was an incentive to ensure employees would continue working. It was a gift to let them come in to work. It was an appreciation, and that's what it says. And many of the other letters say this. Exactly, we can quote from it. It was an appreciation for them coming to work. That's why you give a gift. That's why most people give a gift. You appreciate something. Well, not in all contexts, birthdays and stuff. But in any event, it's an important concept. There are a lot of very important issues packed into this case. What's packed into this case, starting almost backwards, is really the idea that we couldn't respond. Think about it. How would we know which one was wrong? Each was finite. How are you supposed to calculate? They could put whatever they want. Nobody could know how to respond. Second, we won. We won. It wasn't the board that said it. You're way over time now, and I think we're done. I'm sorry. I didn't mean to. No, no, it's fine. I let you go. But thank you, counsel. We'll take this case under advisement.